May I please report? My name is Eileen Ridley. I represent the appellants in the matter. There are appellants on both sides. That's true. You are representing... We're on the first tier. We're on the online guru side. Right. Okay. Are you splitting your argument? No. I have my colleagues, Andrew Serwin and Chad Fuller, but I'll be arguing. Okay. Because I see two names listed. But you're... You may proceed. And I would also ask to reserve five minutes for rebuttal, if I may. You know, whatever you've got left on the clock when you sit down is all yours. Fair enough. Thank you very much, Your Honor. Your Honor, we are here on the issuance, after a three-day trial, of a permanent injunction, which acts as a prior restraint regarding the content of an appellant's website. It is our contention that that injunction and the judgment related to it should be reversed and overturned based on several different factors. The first is that the appellees, in fact, had no standing under Article III,  similarly couldn't bring their 17-200 claim or their Lanham Act claim. And then finally, that the injunction itself is a prior restraint and is violative of the First Amendment. Now, with regard to the first issue on Article III, after a three-day trial, the Court specifically found that the appellees had suffered and had not proved that they had suffered any injury in fact. But all he did was issue an injunction. And when you say injury in fact, you're saying economic loss of some sort. And isn't the law quite clear that under 43A you don't need economic loss to support injunctive relief under the Lanham Act? Well, but it's important, too, under cases like Ford that state that if there's an issue with regard to whether or not there's jurisdiction under Article III, you don't get to the Lanham Act. Once there's a doubt, you don't proceed. And, in fact, what the Court found was there was no injury in fact, and further, that there was no causal connection with regard to the activities of the appellees. Now, injury in fact is kind of a term of art introduced into the law in Justice Douglas' data processing case. I'm not sure the district judge used injury in fact in that Article III sense. What I think the district judge did was you've not proven any past damages. But the district judge also found threat of future harm. And threat of future harm is clearly enough for Article III standing. But, in fact, what the Court stated, and in fact, as Ford notes, that these appellees did not prove, did not prove that they in fact had damages and did not prove a causal connection. But the question is not damages. He didn't award them damages. He gave them an injunction. And he gave them an injunction based upon what the judge found to be a threat of future  harm. That is sufficient for an injunction. That's sufficient for Article III. Whether once we get past standing, there's a significant threat, there's enough threat and so on to justify the injunction. Granted, that's a different question from Article III. Well, and I would also suggest and submit to the Court that, in fact, the trial court didn't actually give them, meaning the appellees, an injunction. The reason why, at least from the ruling of the Court in the decision that the injunction came down, was a perceived concern regarding the public. It wasn't a concern vis-a-vis the appellees or any perceived damage or harm to the appellees. It was a perceived concern about the public. That may or may not be an Article III question. If this plaintiff has a risk of future harm, that's enough for Article III. Once you get over that hurdle and you're trying to decide whether an injunction is appropriate, risk to the public is a relevant factor. No. I'm not saying that the risk to the public isn't a relevant factor. What I'm saying, though, is that the Court, in fact, actually, I believe after the trial, was in fact convinced that there was no harm to the appellees. But the concern, the reason why the Court went to the point considering an injunction was the Court's perceived concern regarding the public. I wouldn't go so far with regard to your point as to whether or not there was a significant issue or threat, that, in fact, there was no evidence of such a threat. Did the trial judge say that there was a threat of likely future harm to the plaintiff? The decision does reference a concern with regard to a threat. But ultimately, when you look at the injunction and why the Court issued the injunction, the Court specifically said that there was no harm to the plaintiff. And do you concede that if there is a threat of future harm to the plaintiff, that is enough for Article III standing for an injunction? I would – I wouldn't say it that way, no, Your Honor. How would you say it? What I would say is that, in fact, there is an issue with regard to Article III standing. Once after a trial, there is a finding that there is no injury in fact. Oh, you didn't answer my question. Well, what I'm saying, though, with regard to the issue with Lanham Act in that context is, and I would note again, the Court, once finding that there was no injury in fact, also decided there was no 17200 claim. And I think that same analysis had to be applied similarly with regard to the Lanham Act. I don't think that it merely had to do with damages with regard to monetary damages. I think it also had to do with the fact that there was no causal connection, as I said, with regard to any activities that the appellants had vis-à-vis the issues raised by the appellees. And again, the reason why I keep going back to why the Court went and decided to issue an injunction according to its decision was not per se a concern with regard to the appellees. You know, sometimes there is really a serious issue as to whether or not there's Article III standing in injunction cases. You get sort of do-gooder organizations. I won't name them, but anybody would have in his or her head a bunch of do-gooder organizations. They just kind of butt in and say, I think you're doing this wrong, and for the good of the world, I want it done differently. This is a the plaintiffs are not that. They're trying to make money. Right. And it's a very odd thing for them to do, to spend all this money on the case, if they think they're just doing it for the good of the world and not for themselves. I don't disagree with you, Your Honor. In fact, I don't think they were doing it for the good of the world. I don't think they ever said they were doing it for the good of the world. Well, then it's pretty obvious that they think that they will be advantaged by this injunction and that they're hurt in the absence of the injunction. But in point of fact, they did not prove it at trial. And in point of fact, there was no – not only did they not prove any damage, they didn't prove any causal connection. They proved confusion, didn't they? I mean, they're both competing for the same, at least in part, for the same audience. And the judge found that the – that your client's website and domain name were confusing. And there was actual evidence of confusion that the judge relied – this is a bench trial. So he relied on actual evidence of confusion, found that they were competing, and found that there was a likelihood of harm to them because of the confusion. People were – people who might visit their website were going to your website thinking that it was their website. And people who thought that they were going to an official website were going to your website because they thought it was an official website. And then he balanced it out in the unclean hands part and basically said you're both doing this together, but that's another issue. But isn't that enough for standing? Your Honor, first of all, I don't think that – I think the court was concerned regarding confusion to the public. I don't – I would not concede that there's evidence of confusion. And, in fact, for evidence of confusion, when you deal with that, you either determine whether or not the statement is literally false. The court said that was not the case. And then you have to show a significant portion. It's critical, according to William Morris, that you show a significant portion of the public is confused. They had some anecdotal references to some individuals who were confused. But given a site that gets hits in the magnitude of 65 million, I would contend that, in fact, there wasn't evidence of a significant portion of confusion. And I would also contend that even under the Lanham Act, the standard is not that you have to show there's no confusion. You know, there are people in the world who walk in a state of confusion. You don't have to have pure non-confusion. The issue is, is there evidence of a significant portion of the public or the recipients that are confused? And that actually was not proved in this case. The court, in its decision, quite apart from any concern with regard to the appellees, was concerned regarding the public. It was – it was – How do you prove something like that? Something like? You said you get 65 million hits, right? Right. That's yearly? Yes, yes. How do you prove – or how do you do more than they have done to prove confusion? I mean, most of those hits you don't know. There are lots of – I mean, they're just hits. They either – and you don't know who they are. It seems to me the evidence they put in was pretty telling. What more do you do? I'm not sure what more one can expect. Well, I would submit, Your Honor, that, in fact, you'd expect much more than what they did, particularly with regard to the survey they provided. Much doesn't tell me. Don't give me a run-up. Okay. Just go right to the thing they could have done. They could, in fact, done a survey, a survey that had a control group that actually showed the website the way that somebody would actually see it and, in fact, use that kind of information to determine if, in fact, there was a factor of confusion. What, in fact, they did do instead was use a survey, but one that was recognized as false. There was no control group. The site wasn't shown as a – Okay. I got it. A survey that meets your standards or whatever, scientific standards. What else? A properly conducted survey. I got that one. And then I think what you'd have to do is a study of the issue. What else? A study of the issue of the amount of claimed confusion versus the determination of the hits. And I would contend, Your Honor, that, in fact, here we have the evidence that, even the hits and the anecdotal evidence that they had and developed through discovery indicated that it wasn't a significant amount. I'm not saying that you would not have an instance where you'd have some evidence of – No, I'm sorry. I heard the survey. I didn't understand anything else you said. Certainly. So is there something else? Let's say we say no survey. We're not impressed by that. What else could they have done? They could have and did seek through discovery any indication of confusion. They can determine whether or not there are any claims with regard to confusion from the entities supposedly that – But they did come up with instances of confusion. You say not enough because there are 65 million hits. You have – But I'm saying what else? What I'm saying is in that context what they did was that procedure was correct, but what they found was not sufficient to show that there was a significant portion of the public that was, in fact, confused. Why not? Because they only have certain anecdotal references, but in the percentage compared to the exposure of the site to the public, that evidence is not sufficient. But we don't know about the 65 million. For all we know, half of them are confused. We know absolutely nothing. We have evidence, concrete evidence of actual confusion that they've presented. No idea at all about what's out there. Other than doing a survey – And I'm very reluctant to say that in every trademark case, in order to show confusion, you have to do a scientific survey in order to make – We've never held that. It used to be that surveys were frowned upon, but I'm – I don't know that we're – I would prefer to say that you need to have a survey, a scientific, a Dawbert-level survey to prove it, but you haven't said anything else. I mean, you've talked a lot, but other than a survey, what else? They've come with actual concrete evidence of people actually being confused, and I still don't quite understand why that's not enough. Because what I'm saying is I'm not saying that looking at whether or not there's evidence of whether there's confusion, such as e-mails or inquiries, isn't appropriate. What I'm saying is just because there is that does not mean you've hit a significant portion of the public based upon – That's why we have trial judges. You know, they sit there and listen to the evidence, and they find what they find. And here we have an experienced trial judge who looked at the evidence and said, yeah, I think this shows confusion. Why isn't that the end of the matter for us? Because it was – On that issue. On the others. Because, Your Honor, the way the court made the analysis, it didn't make the analysis in the context of the total hits. And I understand Your Honor's position of we don't know if there's half confusion or half not. We also don't know if they were all understood. There is evidence to indicate that – We don't know. There is evidence to indicate that – I mean, you want to use the $65 million as a counterweight, as something that says, oh, well, this is just a few things in a sea of 65 million people who are not confused. But you haven't shown that either. You haven't shown that 65 are not confused. The best I can tell, half of those 65 million could be confused just as well. I don't see how it winds up helping you, Annie, that there are 65 million hits out there. Because what I'm saying is in the analysis that the court did, it merely relied on the anecdotal evidence. It didn't make that analysis in the context of the total exposure of the site. It merely said, essentially an analysis that said if you have some confusion, there must be confusion, as opposed to determining whether within the populace that's exposed to the site there's actually a significant portion of the populace that is, in fact, confused. Isn't the judge, sitting as a trier of fact, also permitted to look at the nature of the site itself, of the name of the site, just looking at it? Some things are confusing – would be obviously confusing just by what they say or what they represent. And wasn't that part of his analysis here, too? DMV.org indicates an official site. And then the burden, I think, becomes a lot less on your opponent to demonstrate some of the things you say are necessary to show actual likelihood of confusion. Isn't that part of the mix, in other words, that he's allowed to look at? The court certainly looked at and was concerned with, frankly, the use of DMV in a variety of different registered domain names. But taken as a whole, again, I would direct the court to the evidence that even on the site, there were numerous references in the site actually distinguishing itself from official DMV sites. For instance, one of the missions was to, quote, unquote, provide an easier access of information than one would find on the official site. On some of the webpages presented to the court by the appellees, in fact, they talk about the fact that the pages actually say that the official websites, the official DMV sites are, in fact, confusing. And the point here is to provide it in a much more intuitive, accessible way. It's actually making a distinction as opposed to attempting to be. But you don't get to that disclaimer, if that's what you can call it, until you get to the site. And the whole point is to draw people. It's like a store with a sign out in front. They're trying to draw people to their store, to their site. And by putting DMV.org, if you put that into your domain name on your computer, you'll come up with your organization or DMV on a search engine, and you'll come up with your client.  There's all the advertisements that you're competing with the plaintiffs for. So you've already gotten the customer in the door, in a sense, by confusing them. I mean, I think that's what the judge was concerned about and didn't hold the plaintiffs to the standard where it might have been a name that was at least arguably less confusing than that. Well, the court certainly had concerns with the use of DMV. As to the issue of whether or not the two parties were competitors, again, we would submit that that is, in fact, not the case. We have one party who's basically selling courses that they provide. That is not, in fact, the business that my clients have. But you both have a common cause of trying to sell these courses that you don't provide. But the distinction here is we both have advertisements, but the distinction here is my clients are not providing the product, the service, that is the advertisement's goal. That is distinctly different than the appellees. They are, in fact, trying to sell their product. You are out of time. You didn't lose any time for rebuttal. Do you want to spend a minute or two talking about the substance of the injunction? We've spent a long time talking about, I mean, the First Amendment argument. Yes, Your Honor. I would, if I may, just a minute or two. It's our contention that, in fact, the injunction using a splash page is, in fact, a prior restraint, and is a prior restraint in such a way as to, frankly, feel speech not only of the appellants but also of others, of third parties. For instance, the site has open public forums that permit uses of the site. I'm sorry. How does it show? It just means it requires one more click for people who really want to be there to get to the site. It only turns away people who see the splash screen. The splash screen tells them that they're in the wrong place. What possible First Amendment complaint can there be about preventing people who don't want to be on your site from not getting there? Because the reality is the splash page itself actually acts as a hindrance to even see the speech that's on the site. All you have to do is say, okay. But, in fact, people don't do that. In fact, there are reactions when one gets the splash page because in the world of Internet websites, when you have a splash page, it's usually based on a very regulated site, which is not the content of this site. For example, pornography and gambling. What does that mean, a very regulated site? Because it, in fact, essentially scares away people because some people won't take the effort to go click past it. It is, in fact, a barrier to the speech. But this is commercial speech. It is commercial speech. Okay. So it's entitled to no protection at all if it's deceptive commercial speech. Yes, but true commercial speech is protected. And, in fact, there is speech that is on the site that is protected speech. But the problem is the district judges found that there's a significant portion of this, beginning with dmv.org, that is deceptive. That is to say people are confused. They think this is some sort of an official site. Now, I don't think your client wants to do this, but if it wants to change its address from dmv.org to driversed.com, I don't think you need the splash page anymore. But as I read what the district judge is doing, he says so long as this is called dmv.org, you need an upfront warning to people that this is not a government site. And our contention, Your Honor, is that warning can be done in an exclaimer and that the pure splash site, in fact, the disclaimer provides the information and warns people upon the landing of the site. What's our standard for review of what the district judge thinks is an appropriate sort of curative device for the inherently deceptive dmv.org? Is it abusive discretion? It is. But what I'm saying, Your Honor, is based on the issue on the constitutional principle that, in fact, there is protected speech on the site. And that the restraint could be used. But it's familiar law that you can't turn this into protected speech by having simultaneously unprotected misleading advertising alongside, I don't know, the Declaration of Independence. Right. But again, that suggests there is an intent, which I don't think is there. In fact, by doing the splash page, it basically takes the site as one statement, as opposed to the individual statements that, in fact, is the case, 4,000 to 120,000 pages as it goes. The point is that the idea of restraining speech is you're supposed to have a narrowly tailored effort. And that can be done by way of disclaimer. And even the California Business and Profession Codes, even dealing with this very issue, talks about the use of disclaimers. And the Court went beyond that. Because the Court, even though you had disclaimers on there, the Court still found confusion. So this is really a circular rationale, isn't it? Well, I don't think the Court actually considered the BMP Code and the fact that under it, in fact, it states that a disclaimer is sufficient, particularly when there's a concern about whether or not the site looks or appears to be a site such as a governmental site. The Court didn't really consider that. What the Court did was wanted to put just a splash page, as opposed to a very directed disclaimer as to the fact that it was a private site. And, again, I would submit that the DMV Org is not per se a – the Court found there was no literally false statement on the site. It was concerned with regard to the perceptions of the public. Thank you. Thank you. Thank you. Good morning, Your Honors. I brought all these papers here. I won't have any time to refer to them. My name is David Mackus. May it please the Court, this is Co-Counsel Nina Hamilton and Dan McFarland. My clients are also on the floor. I would like, if the Court permits, to address our two appeals issues by drawing the Court's attention to a theme that's very dear to us. In November 2006, no one was standing up to the well-oiled advertising machine that Mr. Lahode had developed. His skill is unequaled in driving people to his website. It was our client, not the State of California, who was prepared to testify. That trial, the Court did not permit it. It was not the other competitors who were also prepared to testify. The Court did not permit it. But our client. They made $9 million, $10 million in profit. In 2007, my client maybe made half a million. Fifty percent of their profits or their revenues are attributed to the sale and traffic school and driver's ed courses in the United States. We principally compete in two or three states. Our core issue here is this unclean hand, which the Court has found to bar monetary component on both counts, the discords in their profits and the exceptional case requirement. In this regard, I'd like to draw the Court's attention to the, We briefed it of the law. This Court, I think, has the law before it. But our case was 8,000 pages of testimony in trial to prove deceit and materiality. By preponderance, their case was two sheets of emails by clear and convincing evidence. And what did they prove in those two sheets of emails? They proved that Mr. Kramer was growing increasingly concerned with his partner accredited by the prominence of dnv.org in the search engine mechanism. It was placed in a prominent position because they were spending more and more money and the fact that more people clicked on it drove their position up to the detriment of everyone else in the industry. It was confusion. It was confusing. It was deceitful. Certainly injury. Certainly something that our clients can complain about as a competitor in this world. His emails are nothing more than private, angry, frustrated musings. They are not the heart and soul of a bad-faith, unclean hamster. I'll tell you why. The Court requires proof of deceit. The law requires proof of deceit. Proof of fraudulent behavior that actually misleads the public. The cases are remedial. Mismarkings of trademarks, mismarkings of patents have to show that you misled the public. Japan Telecom, Judge Kaczynski's case is not quite here, but we contend. The Court did not follow Telecom, in our view, nor Coca-Cola as to the temporariness. An equally important but lesser point at the moment. The deceit was not shown. What was shown was our clients explored a business relationship, not knowing what was behind the curtain. What was behind that curtain? 7,000 emails of confusion. Aggressive, regulatory demands by the state of California, a state that is bankrupt, God bless our state, that could not and did not choose to proceed but was willing to come to trial to testify. Was that known to my client in April 2006 when it wrote those emails? No. What could have equally been found, Your Honor, in the discovery process, and only through the discovery process, Mr. Lahode was not forthcoming. In the discovery process, we might have found ten license agreements with the state of California and with the state of New York and the state of North Carolina. How do we review the district court's determination of unclean hands? Is it a factual determination that we review by substantial evidence? Is it an exercise of discretion? What role do we play here? It's first and foremost a factual determination as the law sets forward, based on the evidence. Once it is proven by proof. Really? I mean, it's not like your client came to court and showed his hands and, you know, we could have a description of how clean his hands were. Isn't the determination a judgment by the district court as to the equities in the case? Isn't it essentially an exercise of discretion? Your Honor, I would agree with you in proving by the requirement of the law. No, no, I'm talking about what kind of review, what kind of determination it is, not what the facts are in this particular case. When the judge says unclean hands, he's not really describing the visual cleanliness of the party's hands. He's making a determination about something going on in their mind and something about the conduct of the party, right? In part. That is a fact, Your Honor. That is not determined. Something going back to the common law, the maxims of he who does equity, seeks equity, must do equity, and so on, those are things that go back to... He who comes into court must come in with clean hands, as I recall the maxim, something of that nature. No, I think that's what California says in the civil code, but the common law applies primarily to equity. You can't come into equity with unclean hands, and if you haven't done equity yourself, you can't seek equity. And it strikes me that that is not a factual determination. It strikes me that that's essentially an exercise of discretion, and what you have to show is, it seems to me, you can disagree with that, but it seems to me what you have to show is that the district judge abuses discretion finding in denying equitable ratio on grounds of unclean hands. That's a very, very high hell for you to climb. Your Honor, may I politely disagree and offer the following observation? The abuse of discretion standard also includes the failure to follow law. This court did not follow Japan Telecom, did not identify it, identified an unreported opinion of a district court as the basis for its opinion. No Ninth Circuit law of note. Now, the reason I disagree with you is... What is it about Japan Telecom that you find so compelling? Your Honor, we find it that the court has stated, and this follows the Republic Molding line and goes back even further, the Republic Molding is a Ninth Circuit case, 1963. You must show that unclean hand actually leads to deception. The extent of the actual harm caused by the conduct of my client is highly irrelevant. Not just is this an angry, frustrated man internally pondering whether these guys are legal or not. I mean, you say you characterize it that way, but the district judge doesn't have to believe that that is what was going on, an angry, frustrated man making a futile gesture. He can think that this was, he was dead earnest. And so, you know, went upon a path of trying to destroy his competitor. Why, what, what's so crazy about that? I don't think the record shows anybody trying to destroy anybody. What has happened here is that they did... I think you're doing a pretty good job. I mean, if this injunction stays in place, this is going to put a big hemp in your competitor's business, and your client might well rub his unclean hands and inkly and say, we said we do amen, and we've done amen, and the next time somebody crosses us, we will point out that when we say we're going to invade camp, you join them, you lick them, or you destroy them, people are going to mess with us. I'm guessing that's what... This is, I understand everything you said, but I respectfully disagree. This is a fluid, Internet-based environment with two companies who have very little in contact with each other. Testing for six hours is the only extent of their actual interrelationship. For six hours. No proof was offered of what happened. Somebody's paying you to stand there and talk, and I'm guessing your services don't come cheap. So there must be more to it than you let on. There must be more, you know, something at stake here. So you're saying they're not connected by anything else? Well, yes, Your Honor. What's at stake here is that under the Lanham Act, we're entitled to a showing of discordsmen of profits. That is where the court applies its discretion. Once proven, I would agree with you there. If the threshold of evidence satisfies the burden of the law, we submit it did not, and the court didn't even address our points, then the court, in equity, weighs what has been proven versus what we seek. And therein lies the balancing act of how much money are we going to get? This cost our client $800,000 to date, just to give you an idea. So this is something that the law permits them to seek. They're not going to lie. Can we talk about why he found unclean hands? It seems that he had two specific reasons. One was that your client had domain names similar to the defendants that used DMV. One of them was, I think, DMV, onlinedmv.org, pretty close, so that you were, in a sense, engaging in the same type of conduct that he found to be confusing and deceptive by the plaintiffs, and also that you negotiated, and you say that was a very brief episode. But your excuse seems to be, well, these were both – these were all born out of frustration about the defendant's conduct, and it was a reaction to the defendant's conduct. But isn't the trial judge allowed to weigh those types of factors and then use his discretion to reach the conclusion that he did? Your Honor, we don't – we submit, like every other affirmative defense, it has elements that need to be proven by, in our view, clear and convincing evidence. Right. Did your client use those domain names? He did not use those domain names. It registered them. It registered them, and let me point this out, Your Honor. Okay. Why did it do that? This is not a registration case on either side. Mere registration is not an actionable wrong, unless it's a UDRP 43D case, which this is neither side of that. No one's contending that. The registration, per se, is not the problem. It's the driving of traffic. It's using UnitedStates.org to drive traffic to DMV.org, calling it a federal agency. That's fraud. Now, our client stood up to this kind of deceit. For six hours of testing, six hours of testing, de minimis in the scheme, merely exploratory, in a contract we wrote that said they're responsible for holding the copyright and trademarks of everyone else, not us. That was terminated upon the advice of counsel, upon received advice of counsel. Then Mr. Lahode, then, after then, launches a new website in September 2006. Our client studies it and sued. November 17th. Competitors do that all the time. Many competitors do. Licensees work with licensors and then sue them. Do they have unclean hands because they've licensed an invalid patent? For five years, we submit not. Competitors are entitled to explore relationships with each other. And without the knowledge, this is the problem of the trial judge, in our view, in weighing the evidence at all. He attributed the deceit that they practiced to our client wholesale. And that's what I'm trying to say. It was only through the money and time spent finding out what was going on here, soliciting the state of California, and getting that evidence from Mr. Lahode about his commitments to the state that he didn't abide by. That is now attributed to our client as we are in bed with that. As I said, Your Honor, this is important. Mr. Lahode has gone to the state of California to try to license. They've refused. He's got some relationship with Pennsylvania he put on the record. This is a – it is perfectly plausible for our clients to ponder, are they legitimate or not? I had the same question in my head in August of 2006. Do you want to say anything about the appeal, specifically about the First Amendment issue? We don't see any merit in that, just very gently. Threatened injury is sufficient. Article III's standing is clear. Prudential's standing is clear. It's really heavy-handed. The splash screen is, you know, we have to sort of go to another click-through. Why isn't a disclaimer, a prominent disclaimer on the website, maybe a prominent disclaimer visible on the first screen enough or a more measured response? Let me point something out, Your Honor. So this is something that is elusive because the record is a bit ponderous, pardon me. The court did not enjoin them from their false advertising on Google. Google is the 80 percent drivetrain for their business. Eighty percent or more comes in through Google. Eighty percent of it is search engine-based, and 80 percent of that is Google. So be thoughtful on this point. That means that they're driving traffic. Sixty-five percent, thank you, Your Honor. They're driving traffic using the same practices that were not enjoined. We do not condone that as permissible, but the court specifically went right to the website and did not find anything about the literal falsity of their paid-per-click advertising. That's the drivetrain. So where's the gatekeeper? Who stops the confusion? Now, that's why the splash page needs to be followed at least to what the court prescribed. May I speak a minute on the contempt, which segues from the— You never answered my question. You didn't answer a big appeal about Google and all that stuff. Yes, Your Honor. I'm answering it indirectly, and I apologize. It is tailored to the harm that is caused by false advertising to an entry point called the splash page. Is that the court— I understand what it is. You don't have to tell me what the splash page is. Why isn't a disclaimer on the website, a disclaimer visible perhaps on the opening screen of the webpage, why isn't that enough? We tested that. Our survey, and I think Judge Gettleman made a comment on this, I'm not sure, but our survey showed with their unofficial guide and some of the so-called disclaimers, which, by the way, we dispute those as disclaimers. Those are claimers. Disclaimer is what this court ordered. This is a privately owned go away if you don't want to be here. That's what disclaimers are. You know, you get tangled up in your own stuff. You say, oh, well, we tested this, but those weren't disclaimers. So it seems to me you've just sort of cut the legs out from under yourself. It's the sort of thing you want to have. You haven't really tested it. So my question, once again, I'm not going to ask it a fourth time. If you choose not to answer it this time, this will be, I'll have to accept that. Why isn't a clear disclaimer, perhaps one visible on the opening screen of the website, enough? It didn't work. You tested that. We tested that. We gave them the benefit of the doubt. Where is it in the record? Pardon me, Your Honor? That is in the record. It's in the SCR supplement. It's actually in their excerpts of record. How did you test it? We put the screenshots up and tested the screenshots, which had some of this. It didn't have this on it, Your Honor. Pardon me. This is what they currently have up, which is not in compliance with the injunction, by the way. But this is what they currently have up, which is this capital letter thing. This is a private, so forth. That no one tested. Now, maybe they didn't share it with the court or us. But we did give them the benefit of some of these subsidiary points, unofficial guide and such. And we tested that, and there was a high degree of confusion still. That's the court's comment. The court weighed that. The court commented on that. I'm sorry. Unofficial guide. You tested unofficial guide. They had, after we sued them, if I might say this, this all happened after we sued. They didn't do anything before. They just expanded. When we sued them in November of 2006, their counsel sitting to my left started advising them to start putting up different things on the page, we assume. And they tried different sample things. And every time it seemed to change a bit more. They put unofficial guide to the DMV, I believe, on there. They stuck the word info after the word DMV guide. Info or something like that. They put these little refinements in there, these little touches. That's like placing. That's putting the. So when you stood there and said we tested this, the thing I suggested, you really were overstating or perhaps telling me an untruth. I hope you don't think that, Your Honor. I do think that. I think exactly that. I said a clear disclaimer. Now, you can go back and listen to the tape or the audio of the argument. Because I asked it four times. A clear disclaimer on the opening screen of the webpage. And we said we tested that. Okay. I did not. I was not accurate. If I misled you, I did not mean that. If you mean this disclaimer, the court ordered, you're asking me if that's sufficient in lieu of a splash page. Yes. I think everybody in the courtroom except you has gotten that by now. Okay. And, you know, I have no idea why you think it's important to stonewall on this rather than give me a straight answer. Your Honor, that's the process of waiting. That's okay. The answer would be that should have been brought to the court's attention in the remedial phase of this trial. I understand, but that's the question you want to ask. You heard my question. I don't know what the effect of that would be, so I cannot answer it. We don't have any evidence. So you don't know whether it would be enough or not. I do not know, Your Honor. You understand it would be a less intrusive alternative. I understand that. Okay. We don't accept it. We understand that. We don't accept that, and we don't think the record supports it, and they've made no showing of that. So in that regard, they have not put before the trial judge any of the things that you suggested. I may be beating a dead horse here, but what did you mean when you said, we tested that? I meant we tested language. Who's we? Who's we? We is. Your client. Our client, our consultant, Thomas Moronic, at trial in Survey No. 3, I believe it was, tested the visual nature of the survey page, which they were using at that time, which was six or eight months after we sued them, which had additional language placed on it, which they put on there now. They call it disclaimer. They call it added disclaimer. That's what I'm trying to get clear on. And so you have your person testing whether that is sufficient. He then presents evidence to the court as to whether or not that was sufficient to clear up the confusion. That's what you mean when you say, we tested that? When I say we, I mean at trial it was done for the evidentiary point by an outside consultant survey action. Employed by your clients. Employed by our firm, technically, yes. Okay. Dr. Moronic. And that was presented at trial? Yes, it was. And it's commented on, Your Honor, as to the insufficiency of it. So if I may speak briefly about the contempt now. The court has asked about the scope of the injunction. Putting that issue aside, the injunction that has been issued has not been complied with. And as we stand here today, it is not in compliance. And they have essentially made one argument, one argument, we don't like it. That's their argument. It hurts our business. It hurts our marketing. This is a federal court. You took this to the district judge? We put our record in the district court. The district court made a summary. He stated two paragraphs of what both sides contended and then said they're in substantial compliance. And isn't that all that's necessary? I mean, it's a judge enforcing his own order in the context of a contempt motion. And don't we, as an appellate court, leave that type of discretion? Aren't we highly deferential to that type of discretion? He knows what he meant by his order. He certainly knows what substantial compliance means. And even though you may have a good point that it didn't match the letter of the injunction that you got, he said it's good enough, let's let it go at that. Isn't that his job in the district court? We have to agree with the general proposition you've raised, yes. The court does weigh and add discretion to this mix. It's an abuse of discretion standard. We contend he abused his discretion. He didn't enforce one of the clauses. I can't believe you spent your client's money appealing that issue. I mean, this is a district judge who's looked at this case, gave you injunctive relief. You go to him in contempt. He says, no, this is what I meant. And you come here and you spend your client's money and waste our time arguing that the district judge didn't know what he was joining? Well, it shows that they're engaging. I hope you give your client a refund for what you spent on that issue. Anyway, I think we're way out of time. Thank you, Your Honor. You're out of time as well. Would you like a minute for rebuttal? Yes, Your Honor, and I will make it a minute, recognizing the time. With regard to the issue of unclean hands, there was much more than what counsel is describing. In fact, the record reflects that his clients actually sought a relationship with our client, and actually when that actually entered into a contract, actually participated. And then when that didn't work out to their satisfaction, they took what they admit to be, if you can't join them, shut them down. So their client, notwithstanding the characterizations that we heard today, is not here for the good of the public. They acted in a way for what they perceive to be their own benefit. Do you acknowledge the difference between merely registering similar domain names as opposed to using them as your client did? I don't for this purpose. In this matter, when the court was making its determination, it actually used the listing for each site of what they had registered as part of its analysis. So, in fact, the mere registering is, in part, part of the analysis that the court used on either side of the aisle here. But they never actually used that name. But, in fact, there were sites that weren't used by my clients that also, the same sort of analysis was addressed by the court and was held against them with regard to the issue regarding willfulness. I want to make sure I get the answer. They never used any of those registered names, correct? That is correct. Okay. And your client did use, in fact, that's the problem, used dmv.org. It might have registered from others, but dmv.org is probably the best one in the bunch. We did use it. But I guess my point is we also registered other sites. I understand that. Why would your client register those others and then not use them? I'm not going to say I'm in the mind of my client. People register sites because of a consideration of using them in the future. Or preventing others from using them? Some people do. I would not say that was my client's interest. It was the interest of using them in the future, which I would contend would be the same reason why the appellees registered the sites they have. It's possible, though it occurs to me that sometimes you might want to register domain names because if dmv.org is so useful, some of these others that they've registered or that your client has registered might be useful and you're trying to prevent competitors from using them. There have certainly been cases like that. And do we have any evidence on the record as to motivation for registering either by your client or by the other side? No, Your Honor. We have merely the fact of the registration. That's exactly right. Okay. That's exactly right. The other thing I would note, too, is the issue with regard to unclean hands is, in fact, a defense to Lanham claims under Flood Ruckers. That, again, questions the standing at least vis-à-vis the claims of these appellees. And then, finally – Can unused domain names be unclean hands on the Lanham Act? The Lanham Act deals with marks used with the public. Yes. How can registering, which is not a public act, it doesn't attach it to a good or service, how can that even be cognizable in the – I mean, that's sort of like saying, you know, he has unclean hands because he kicks dogs. Right. I mean, it has nothing to do with the Lanham Act, does it? Well, I would not disagree with Your Honor, but in the same guise of that question, I would also question the trial court's determination of willfulness based on the fact that there were other registered sites on the Lanham Act. We can talk about that, but right now we are talking about unclean hands. And if you want to say, yes, in fact, this court earned us the unclean hands and therefore we should win on our issue, we can go there. But right now we're talking unclean hands. And I think there was a multifaceted analysis with regard to unclean hands. Part of it was certainly the – excuse me – registration of the domain names. And that part was wrong. Yes, I would agree that it was wrong, and to the same extent was wrong as a basis of the finding of willfulness to my clients. But the analysis on unclean hands vis-à-vis their own participation, vis-à-vis their participation in the website, their interest in working with DMV.org, their actual working, and in fact their goal to, if you can't join them, shut them down, I think is sufficient with regard to the unclean hands issue. Well, let's talk about the shutting them down. What's wrong with that? Because, Your Honor, what's wrong with that was what we have here is a concerted effort. It's not an issue of concern of the public or confusion. It is an issue of wanting to shut a competitor down because they are successful. I know. So what? Why is that unclean hands? Isn't that what they all do? Wouldn't sort of Microsoft like to shut Apple down? Wouldn't – you know, isn't that the way it goes? Isn't that what competitors do is try to get the business away from their competitors? And they use – sometimes they use competitive tools. Sometimes they go into court and all that. This is just part of doing business in America. What's wrong with that? What's unclean about it unless one says that commerce itself is unclean? I would not say commerce itself is unclean. And I think – I would hope not. Excuse me? I would hope not. I would – and I would also say that competition is something that the American system actually encourages and wants. But to actually – Let's say you find out that a competitor of yours – let's say you're in the food business, a restaurant business, and you find out that your competitor is buying adulterated meat or has rats on his premises or that the employees don't wash their hands. And so having no interest of the public at heart at all, you rat them out to the health department. And you say, go after them. And you say, why did you do that? He says, well, is it because you're worried about all those people who go there and eat? They say, no, because, you know, they're down the road. They're taking away business from me. And if they get shut down by the government, I'll get more business. Is that – what's wrong with that? That's the American way, isn't it? Not entirely the American way, but – Well, why is it not the American way? Because, Your Honor, for a couple of reasons. Because it's one thing to have an issue with regard to, you know, the health of a restaurant and all of that. It's another thing to participate in a restaurant. And then when it doesn't succeed to your benefit actually getting information with regard to how that business is run, then step aside, decide to then create a, quote, unquote, allegedly competing business in order to create a basis to bring a lawsuit to bring the opposing competitor down. That's something entirely different. That is unclean hands. That is participating. And then it's essentially – I mean, you make it sound dirty, but I don't see what's so dirty about it here. So that's what they do. So what? You know, here's my problem with that argument. It's an interesting argument, and I go along with you to a certain extent. That is to say, in your view, the plaintiffs tried to take advantage of the business that was being driven by DMV.org because they wanted to have their link set up on your client's website and so on. And once it turns out they couldn't reach a deal that was mutually satisfactory, your clients apparently wanted too much money, they said, okay, we're not doing that. And you say, well, it's unclean hands because they sought to profit from DMV.org. But the underlying premise of your argument is that DMV.org is illegitimate. Well, I'm arguing this in the context of the order. That if, in fact, there's a – obviously, I disagree with that. But if you disagree with the argument or the contention that DMV.org is illegitimate, you have trouble then arguing that they have unclean hands by trying to take advantage of your client's business model. Well, it's not only trying to take advantage of the business model. It's actually participating in it. It's essentially doing the exact same thing and yet saying, well, we're both doing the same thing, but the party to my left should be in some way restricted. Well, I am not. That's the – they themselves have benefited. Well, the restriction they want is they say your client is using a misleading entry point, DMV.org. We are not using a misleading entry point, and we want to stop them doing that or at least put up a curative instruction so that when somebody goes to the website, they won't think that it's official. But, in fact, they're not saying that. They're saying they want to shut it down. Well, fair enough. And, in fact, that's the reason why they're arguing. That sounds like Adam Smith to me. Well, but not really because Adam Smith wants two healthy competitors, not a shutdown. The two healthy competitors would deal with not a complete blocking of information. It would go more to the disclaimer, which, again, I would refer back to the Business and Professions Code of California. You know, the – 17.533.6 specifically says if there's an issue with regard to the identity towards a government entity, it's a disclaimer that's used. It's not a complete shutdown. And the reason why they are so vehemently interested in having the splash page is because they know what it does. It stops the business. Okay. Okay. Thank you. Cases, I will stand for a minute. We are – I'm sorry. No, we're not adjourned. We've got one more case. We're going to take a five-minute break before the last case on the calendar.
judges: Gettleman, Kozinski, Fletcher W.